J-S31029-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: L.L. A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.L., BIRTH FATHER | |
| | No. 159 WDA 2017 |

Appeal from the Order December 22, 2016
in the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000101-2016

BEFORE:  PANELLA and DUBOW, JJ., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY DUBOW, J.:                    **FILED JULY 7, 2017**

S.L. ("Father") appeals from the Order involuntarily terminating his parental rights to his daughter, L.L. ("Child") pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a) and (b).  We affirm.

**SUMMARY OF FACTS AND PROCEDURAL HISTORY**

We summarize the trial court's factual findings as follows:  Father and L.G. ("Mother") are the natural parents of Child, who was born in January 2012.[1]  On May 4, 2015, Allegheny County Office of Children, Youth, and Families ("the Agency") obtained an Emergency Custody Authorization ("ECA") after Father presented at a local hospital with Child and claimed

---

[1] The court also terminated Mother's parental rights by the Order at issue. She has not filed an appeal.

they were both victims of a sexual assault from a man that broke into their house while they were sleeping. The local hospital transferred Child to a children's hospital where medical staff found no evidence of trauma or abuse. While at the hospital, Father also reported that secret agents were spying on him with devices and that a constable was stalking him. The Agency had concerns about Child's safety in light of Father's mental health status, and upon obtaining the ECA, the Agency placed Child into foster care.

On May 12, 2015, the court held a shelter care hearing and ordered that Child remain in foster care pending an evaluation of Mother's home, and granted the Agency permission to place Child with Mother prior to the next hearing. The court restricted Father to supervised visitation with Child.

On or about May 15, 2015, the Agency placed Child with Mother and provided crisis in-home services. Mother subsequently moved in with Father in violation of the court order restricting contact between Child and Father. On June 19, 2015, after Mother refused alternative housing, the Agency obtained a second ECA and removed Child from Mother's care.

On June 26, 2015, the court adjudicated Child dependent. At that time, the court found that Father "appears to have paranoia and needs to be assessed to see if delusional conditions exist. Father's actions in attempting to protect [Child] (constantly moving, calling police, etc[.]) are the result of his paranoia and are actually causing [Child] to be without proper parental care and control." Order, 6/26/15, at 1. The court ordered Father to participate in a mental health evaluation "to determine if he has a mental

illness which causes delusions and whether he needs treatment for a delusional disorder beyond (or different) from what he is currently receiving." *Id.* at 2.

The Agency created a family service plan ("FSP") which established the following goals for Father: (1) obtain a mental health evaluation; (2) have supervised visitation; (3) attend parenting classes; (4) maintain appropriate housing; (5) sign releases; (6) continue mental health therapy; and (6) obtain a car. The Agency made various referrals to aid Father in achieving his FSP goals and arranged for supervised visitation multiple times per week.

On August 5, 2015, Gary Vallano, M.D., a board certified adult psychiatrist, examined Father. After the psychiatric examination, Dr. Vallano diagnosed Father with Delusional Disorder, Persecutory Type, and recommended that Father engage in treatment with a therapist specifically trained in the treatment of Delusional Disorder and that Father obtain an evaluation for anti-psychotic medications. Over a year later, on October 20, 2016, Dr. Vallano conducted a second psychiatric examination of Father and the diagnosis and recommendations remained the same.

On September 3, 2015, Eric Bernstein, Psy.D., a licensed psychologist, conducted an individual psychological evaluation of Father, gave Father a provisional diagnosis of Delusional Disorder, Persecutory Type, and recommended that Father pursue specific therapy. A month later, on October 29, 2015, Dr. Bernstein conducted an interactional psychological evaluation of Father and Child. During the evaluation, Father reported to Dr.

Bernstein that his current therapist did not consider him delusional and was not providing treatment for Delusional Disorder. Dr. Bernstein once again gave Father a provisional diagnosis of Delusional Disorder, Persecutory Type, and recommended that Father pursue specific therapy. Additionally, Dr. Bernstein expressed concerns regarding Father's ability to recognize Child's developmental abilities and needs. Dr. Bernstein encouraged parenting classes and recommended that the visits should remain supervised.[2]

On September 18, 2015, the court held a three-month permanency review hearing. The court made a finding that Father made "minimal progress toward alleviating the circumstances which necessitated the original placement. Father continues to deny [that] he is delusional." Order, 9/18/15, at 1. The court ordered the Agency to make a specific referral to a program that treats Delusional Disorder and ordered a referral for a parenting capacity evaluation.

---

[2] In November 2016, Dr. Bernstein attempted to conduct another individual psychological evaluation of Father and another interactional psychological evaluation of Father and Child. Father did not show up at the scheduled time for the evaluation, and Dr. Bernstein found Father one-and-a-half hours later sleeping on a couch with the lights off in an annex to the waiting room. When Child arrived for the interactional evaluation, Father became extremely agitated that Dr. Bernstein diagnosed him with Delusional Disorder in previous evaluations and argued with Dr. Bernstein in front of Child. Father's "level of hostility, anger, and behavior prevented the interactional from completion." Agency Exhibit 1, Psychological Evaluation, 11/15/16, at 7.

On December 18, 2015, the court held a six-month permanency review hearing. The court made another finding that Father made "minimal progress" and "continues to deny that he is delusional." Order, 12/18/15, at 2. The court ordered, "Father must enter and participate in treatment if he wishes the court to consider return of [Child] to him. It does not appear that [Father] will acknowledge his delusions, however, [Father] needs to understand the negative impact on [Child] of his actions (moving around, calling police) as a result of his belief that he was being followed and is in danger." *Id.*

On March 29, 2016, the court held a nine-month permanency review hearing. The court found Father to be in moderate compliance with his permanency plan, noted that he just started parenting classes, and noted that Father was not attending visitation regularly. Father did not provide the Agency or the court any information regarding his mental health treatment status.

On May 31, 2016, the Agency filed a Petition for Involuntary Termination of Father's Parental Rights ("TPR Petition") pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).

On July 27, 2016, the court held a twelve-month permanency review hearing. The court found Father to be in moderate compliance with his permanency plan. The court found that Father was not in mental health treatment, that Father needed housing, and that there were "issues" with some of the visits. Order, 7/27/16, at 3.

On December 2, 2016 and December 21, 2016, the trial court held a termination of parental rights hearing. The Agency presented the testimony of Dr. Bernstein, psychologist; Melanie Rambish, permanency specialist; Marci Bolger, adoption caseworker; and Kelsey McKenna, foster care case specialist. By stipulation of all the parties, the Agency entered into evidence the August 5, 2015 and October 20, 2016 psychiatric reports authored by Dr. Vallano.

During the hearing, the Agency presented evidence that both Dr. Vallano and Dr. Bernstein diagnosed Father with a type of Delusional Disorder and that Father was non-compliant with recommended treatment. Father has stated to the Agency, Dr. Vallano, and Dr. Bernstein that he does not believe that he has a mental health diagnosis. Father discontinued mental health treatment in March 2016 when Father's ongoing therapist changed his diagnosis to Delusional Disorder and began specified therapy to that effect.

The Agency presented evidence that Father failed to engage in appropriate and consistent visitation. The Agency initially arranged supervised visitation in the community three to four times per week. Father typically arrived between 15 to 45 minutes late to visits and often called to change the visit time and location after the visit began. In March 2016, the Agency decreased visitation to twice per week due to Father's inconsistent attendance. After the decrease in visitation, Father attended approximately half of the visits. Father spent significant time during the visits speaking to

case aides about himself rather than interacting with Child and Father often did not respond to attempts to redirect his attention to Child. Father discussed inappropriate topics with Child, often giving her false hope of returning home to him imminently. Father insisted that Child only eat organic food from a specific grocery store, Trader Joe's, so that Child would not get fat. Father also brought inappropriate amounts of food to visits, for example, 60 pieces of fruit. Father never progressed to unsupervised visitation.

The trial court heard testimony that Father completed a parenting class, but that the Agency continues to have concerns regarding Father's parenting. Specifically, because Father is not engaged in appropriate treatment, Father continues to have delusional beliefs about Child's health and safety and continues to schedule an excessive number of medical appointments for Child. Father insists on taking Child to the hospital for minor bumps and bruises and Father requested that Child receive Invisalign braces at the age of four.

The Agency presented evidence that Father failed to maintain consistent housing and employment. Father was homeless or without appropriate housing from June 2016 until the date of the termination hearing.

Father testified on his own behalf and presented the testimony of Vanessa Shaw, parent mentor. Father admitted that he was not currently participating in mental health treatment. Ms. Shaw testified that she

observed Father and Child interact in parenting classes in March 2016 to May 2016 and that Father was cooperative and progressed appropriately.

By Order entered on December 22, 2016, the trial court terminated Father's parental rights pursuant to Sections 2511(a)(2), (5), (8), and (b). Father timely appealed. Father and the trial court and both complied with Pa.R.A.P. 1925.

**ISSUES ON APPEAL**

Father raises the following issues on appeal:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511 (a)(2), (5) and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that [the Agency] met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of [Child] pursuant to 23 Pa.C.S. § 2511(b)?

Father's Brief at 5.

**LEGAL ANALYSIS**

"[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). This standard of review requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *Id.* "If the factual findings are supported, appellate courts

review to determine if the trial court made an error of law or abused its discretion." *Id.* We may reverse a decision based on an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* We may not reverse, however, "merely because the record would support a different result." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, the trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted). In addition, in order to affirm the termination of parental rights, this Court need only agree with any one subsection under Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In the instant case, we will analyze Section 2511(a)(2). 23 Pa.C.S. § 2511(a)(2).

**Termination Pursuant to 2511(a)(2)**

Under Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) [that] such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) [that] the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re A.S.*, 11 A.3d 473, 479 (Pa. Super. 2010) (citation omitted); *see also* 23 Pa.C.S. § 2511(a)(2).

Parental incapacity is not limited to affirmative misconduct, but may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.,* 797 A.2d 326, 337 (Pa. Super. 2002). A parent has a duty to work towards reunification by cooperating with the rehabilitative services necessary for him to be able to perform parental duties and responsibilities. *In re Adoption of J.J.*, 515 A.2d 883, 890 (Pa. 1986). A parent who is unable or unwilling to meet the "irreducible minimum requirements" to care for a child after given adequate resources "may properly be considered unfit and may properly have his or her rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa. Super. 2001).

This Court has defined "parental duties" in general as the obligation to consistently provide safety, security, and stability for the child:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the

> child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty … requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations and paragraph breaks omitted). "Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his parental rights may be forfeited." *A.S.*, 11 A.3d at 481 (citation omitted).

And most importantly, "parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [] her physical and emotional needs." *In re B., N.M.*, *supra* at 855 (Pa. Super. 2004) (citations omitted).

In the instant case, the trial court properly concluded that the Agency presented clear and convincing evidence to establish all three elements of Section 2511(a)(2). The trial court opined:

> Child has been in care since June 19, 2015. The facts unequivocally establish that Father's inability to meet his FSP goals, most importantly his unwillingness to undergo mental health treatment, renders him unable to assume a role in which he is able to provide essential parental care for Child.
>
> * * *
>
> This Court was most swayed by Father's failure to address his mental health goal. Despite his attendance of ABS therapy from March of 2014 through March of 2016, [the

- 11 -

> Agency's caseworker] testified that Father "does not feel he has a mental health diagnosis" and has not participated in any type of mental health treatment since March of 2016. Most notably, [the Agency] had concerns about Father's mental health and that "his delusions would incorporate or include [Child]."

Trial Court Opinion, 2/22/17, at 6, 8 (citations omitted). There is ample evidence in the record to support the trial court's conclusions.

Father has failed to demonstrate an ability to remedy the circumstances that led to Child's placement – namely his delusions. Father reported to both the Agency and his mental health evaluators that he did not believe he had a mental health diagnosis. Although Father engaged in therapy through ABS, he discontinued treatment when ABS started specific treatment for a Delusional Disorder.

Father's refusal to engage in appropriate mental health treatment has caused Child to be without essential parental care and subsistence. Father is unable to maintain consistent employment or appropriate housing. Father has been unable to progress to unsupervised visitation with Child. Father only attended half of the scheduled visits with Child and always arrived late. Visits were often inappropriate, as Father would focus his attention on conversations with the caseworker rather than Child, and he discussed inappropriate topics with Child.

The Agency continues to have concerns about instances where Father's delusions involve Child, including Father's unreasonable concerns about Child's appearance and health. Father continued to schedule numerous

unnecessary medical appointments based on the false belief that Child was suffering from abuse and became agitated with the health professionals when they found no ailment or injury. Father insisted that Child only eat organic food from a specific grocery store, Trader Joe's, so that she would not get fat and Father requested that Child receive Invisalign braces at the age of four.

This evidence supports the trial court's conclusion that Father's "incapacity" is causing Child to be without essential parental care and subsistence and Father is unwilling to remedy the situation with appropriate mental health treatment pursuant to 23 Pa.C.S. § 2511(a)(2).

Father argues that the trial court erred in terminating his parental rights because, "[g]iven the healthy condition of Child at the time of removal, it must be concluded that the sole basis for the trial [court]'s conclusion that an incapacity to parent was proven by clear and convincing evidence is that he was found to be delusional." Father's Brief at 16. Father avers that this conclusion is contrary to the testimony of Dr. Bernstein, who testified that a delusional disorder does not automatically preclude a parent from being a typical parent. *Id.* at 17 (citation omitted). Father's argument lacks merit.

Contrary to Father's assertion, Dr. Bernstein testified that an individual with a diagnosis of Delusional Disorder could be a "typical parent" **as long as they accepted the diagnosis and engaged in treatment**. On direct examination, the Agency questioned Dr. Bernstein:

- 13 -

Q. But in and of itself, a person with a diagnosis provisional or not of a delusional disorder, that in and of itself doesn't indicate whether an individual can safely parent, is that correct?

A. As I said, that's exactly correct. So, the fact that somebody is having a delusion which essentially [is] a symptom of psychosis but to the level of what would be considered schizophrenia, **it does not preclude them from being a typical parent. Presumably, as long as they are aware of their vulnerability, that they are seeking help to try and gain improvement and are working to make changes as appropriate.**

N.T., 12/2/16, at 50-51 (emphasis added). Dr. Bernstein recommended that Father participate in therapy, and, if indicated, psychiatric care.

On cross-examination by Father's counsel, Dr. Bernstein further explained the correlation between Father's mental health diagnosis and his ability to parent Child:

Q. So, strictly, that in and of itself, the only impact it would have on his parenting would be whether or not it posed an imminent risk to [Child], correct?

A. Well, it's harder to - - now, we're getting into a little bit of theory and conjecture because as much as we are talking about diagnoses and constructs, if you will, when it's reduced to a basic level, you really have to look at the individual's behavior. The situation. So, what I mean by that is, if we accept for the sake of discussion that [Father] had been acting under a state of delusion when he believed that he and [Child] had been victim to sexual assault, the fact that then therefore [*sic*] after the authorities are involved and that [Child] presumably had been subject to physical or some type of an examination, not to mention removal from home environment, placed in a hospital setting, etc., interactions with authorities, that would be an example of [Child] being impacted by, in this case, [Father's] mental health.

But in and of itself, the fact that [Father] has this diagnosis, doesn't necessarily mean that [Child] is at any increased risk. It's really how [Father] is going to respond and whether or not he is going to seek help that will ultimately result in positive change.

N.T., 12/2/16, at 79-80.

On redirect examination, Dr. Bernstein continued his testimony and cautioned that if left untreated, Father's mental health issues put Child at risk:

To the extent the condition remains stable from the time in which I evaluated him with that particular provisional diagnosis, I believe in 2015, assuming that he remains stable, then, the extent to which he perceives the environment as threatening and/or that he and/or [Child] is at risk and takes corrective action in order to protect him and [Child] that could ultimately affect [Child] insofar as the steps that he takes. Whether by involving the authorities. Whether it's from his perception of either of them have been victimized and/or are in danger.

So, to the extent that [Father] involves others and/or [Child] specifically in the provisional delusion itself is going to impact [Child]. Now, if the condition worsens or progresses over time and becomes more severe and more consuming, then the argument just takes - - it would be even that much more relevant.

N.T., 12/21/16, at 6-7.

Dr. Bernstein's testimony demonstrates how a diagnosis of Delusional Disorder, if left untreated, can affect a Child. The record reveals that Father never believed he had a Delusional Disorder, never engaged in specialized mental health treatment, and admitted during the hearing that he was not currently receiving any mental health treatment. Father's inconsistent and inappropriate visitation, lack of employment, and lack of housing all

demonstrate that his untreated mental health diagnosis is affecting his ability to provide essential parental care and subsistence to Child. Father's refusal to engage in appropriate treatment renders him unable to remedy the situation. In contrast to Father's assertion, Dr. Bernstein's testimony supports the trial court's conclusion that Father's refusal to engage in appropriate mental health treatment renders Father unable to provide proper parental care and subsistence.

Our review of the record supports the trial court's conclusion regarding Father's progress in meeting his goals. It was for the trial court, as a matter of credibility, to determine the weight to give Father's attempts at seeking mental health treatment. *In re M.G.*, *supra*. Finally, our review of Dr. Bernstein's testimony in its entirety refutes Father's assertions regarding his ability to parent and, in fact, legitimizes the Agency's ongoing concerns regarding Father's mental health. In sum, the record supports the trial court's conclusion that the Agency has proven by clear and convincing evidence that termination of his parental rights to Child is justified pursuant to Section 2511(a)(2) of the Adoption Act.

Given this conclusion, we need not consider Father's claims regarding the trial court's additional determinations that the Agency met its burden of establishing his parental rights should be terminated pursuant to Section 2511(a)(5) or (a)(8). *In re B.L.W.*, *supra*.; *see also* 23 Pa.C.S. § 2511(a)(5) and (a)(8).

**Termination Pursuant to Section 2511(b)**

We also agree with the trial court's determination that the Agency met its burden under 23 Pa.C.S. § 2511(b), and that terminating Father's parental rights is in the best interest of Child.

With respect to Section 2511(b), our analysis shifts focus from parental actions in fulfilling parental duties to the effect that terminating the parental bond will have on the child. Section 2511(b) "focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court found that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into [the] needs and welfare of the child." In addition, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* The extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008).

In the instant case, the trial court determined that the evidence presented at the TPR hearing established that termination of Father's parental rights was in the best interest of Child. It stated:

> Here, this Court judiciously evaluated the bond between
> Father and Child and determined that there was no

indication that an emotional bond exists to the extent that the termination of parental rights of Father would cause Child to suffer extreme emotional consequences. In reaching this conclusion, this Court relied upon the testimony of Eric Bernstein, a licensed psychologist[.]

Trial Court Opinion, 2/22/17, at 12 (citation omitted). The court then discussed at length Dr. Bernstein's observations of Father and his interactions with Child, as well as his testimony concerning how the third evaluation was ended early by Dr. Bernstein due to Father's verbally aggressive behavior in front of Child. According to Dr. Bernstein, at this third meeting Father ignored Child's attempts to get his attention and instead:

> angrily challenged the diagnoses that had been rendered in previous evaluations and/or testimony. . . . He proceeded to insult the Court and myself and planned to submit researching facts that he believes would influence the Court and help them understand his position.
>
> I encouraged [Father] to refrain from further complaint, but instead to engage [Child] in a supportive and attentive manner. And the purposes of the meeting really was to give her attention and to spend time with her for my observation of his parenting relationship.
>
> [Child] attempted to communicate with [Father] and he ignored her and continued to engage in what I considered to be a rant. His hostility increased gradually. And eventually then, he appeared unwilling or unable to give [Child] the attention that was appropriate and the intensity of his complaints increased to a level that I thought was inappropriate for her to hear. So, I decided to end the appointment.

Trial Court Opinion, 2/22/17, at 14 (citing N.T., 12/2/16, at 72). Finally, we note that, when asked about his observations regarding physical interaction

with Child, Dr. Bernstein stated that he did not "recall there being any actual affection of hugs or anything of that sort." N.T., 12/2/16, at 86.

The trial court also noted Dr. Bernstein's testimony regarding his evaluation of Child's interactions with her foster parents. According to Dr. Bernstein, the foster parents "eagerly engaged [Child]. Showed interest in [Child]'s activity. Encouraged [Child] to be active and playful." Trial Court Opinion, 2/22/17, at 13 (citation omitted). According to Dr. Bernstein, the foster parents provided Child with attention and support, and, in return she "showed them respect." *Id.* at 14. The trial court noted Dr. Bernstein's conclusion that the foster parents "presented as a committed pair of adults who recognized the importance of supporting [Child's] emotional needs and physical needs. They offered a balance of attention and structure and support." *Id.* at 15 (citation omitted).

Given this discussion, the trial court then concluded:

> This Court was within its discretion when it determined that severing Child's bond with Father would not cause extreme emotional consequences. The evidence established that termination will be able to provide Child with much needed stability and permanence at her young age. This Court concludes that the developmental, physical and emotional needs and welfare of Child would be best served by terminating Father's parental rights.

*Id.* at 15-16.

Father's initial claim that the trial court's consideration of his parental bond with Child "was nearly superficial," is belied by the above discussion by the trial court. Father's Brief at 22. Father then cites his own testimony to

assert that he enjoys a strong, loving relationship with Child, and that termination of his parental rights "unnecessarily and permanently terminates this loving relationship between [them]." *Id.* Once again, we note that the weight and credibility to be assigned the witness's testimony was exclusively in the province of the trial court. *In re M.G.*, *supra*.

Finally, we reject Father's attempt to claim error because the trial court did a comparison and concluded that Child "is better off in the prospective adoptive home." *See* Father's Brief at 22-23. Our review of the record establishes that the trial court properly evaluated Child's developmental, physical, and emotional needs in reaching its conclusion that the Agency established the requirements of Section 2511(b).

**CONCLUSION**

In sum, our review of the record reveals that the Agency provided clear and convincing evidence that the trial court should terminate Father's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(2) and 2511(b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>7/7/2017</u>